## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| George Kattula, individually and on behalf of all others similarly situated,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>Coinbase Global, Inc., and Coinbase Inc.,<br><br>　　　　　　Defendants. | CIVIL FILE ACTION<br><br>NO. _____<br><br>**COMPLAINT – CLASS ACTION**<br><br>JURY TRIAL DEMANDED |

Plaintiff George Kattula, on behalf of himself and all others similarly situated, files this Class Action Complaint against Coinbase Global, Inc. and Coinbase, Inc. for declaratory judgement, damages, injunctive relief, and other equitable relief. Based upon personal knowledge of the facts pertaining to himself and the investigation of counsel, Plaintiff alleges as follows:

## INTRODUCTION

1.      This is a class action brought by Plaintiff on behalf of all Coinbase "wallet" and account holders who have had their accounts breached and incurred losses arising from the unauthorized transfer of assets – including the unauthorized transfer of "crypto" securities listed on Coinbase's platform without a registration

statement, without Coinbase having registered as a broker or dealer, and without Coinbase having registered as a securities exchange.

2.      Coinbase Global, Inc. is a publicly-traded corporation involved in the business of cryptocurrency exchange. Its wholly-owned subsidiary, Coinbase, Inc. ("Coinbase"), provides an online platform where consumers can store their currencies on a digital "wallet," as well as to buy, sell, spend, and trade cryptocurrency on exchanges ("platform").

3.      Coinbase holds itself out as a regulated and fully compliant entity, registered with the United States Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") as a Money Services Business, as that term is defined by FinCEN. Coinbase also holds itself out as compliant with the Bank Secrecy Act, the USA Patriot Act, states money transmission laws, and corresponding regulations.

4.      Coinbase is the largest cryptocurrency exchange in the United States. According to Coinbase, it has "built [its] reputation on the premise that [its] platform offers customers a secure way to purchase, store, and transact in crypto assets." In its words, what "sets [Coinbase] apart" from competitors is its "customer technology[,] [which is] built to deal with the real-time, global, and 24/7/365 nature of the crypto asset markets."

5.     Contrary to its representations, Coinbase does not properly employ standard practices to keep consumers' accounts secure.  And Coinbase improperly and unreasonably locks out its consumers from accessing their accounts and funds, either for extended periods of time or permanently.  Because of the extreme volatility of cryptocurrencies' value – with freefalls of 40% within 24 hours not unheard of – the inability to access an account to sell, buy, or trade cryptocurrency leads to severe financial loss to account holders. Making matters worse, Coinbase fails to timely respond to customer pleas for support and help, and also fails to preserve and safeguard customer assets as it promises. Coinbase's failures have prevented Plaintiff and Class Members from having "full control of [their] crypto" and from being able to "invest, spend, save, earn, and use," or withdraw their funds as Coinbase promises.

6.     Moreover, Coinbase does not disclose that the crypto assets (or "cryptocurrency") on its platform are securities.  Indeed, Coinbase boldly flouts federal and state laws by proclaiming it does not need a registration statement for those securities and by refusing to register as a securities exchange or as a broker-dealer.

7.     As a result of Coinbase's conduct, Plaintiff and Class Members have been damaged through the loss of their wallet and account access, the assets and

investments in those accounts, the theft of sensitive personally identifiable information stored in their Coinbase accounts, and, among other things, their investment opportunities.

8.     Accordingly, Plaintiff seeks damages and equitable relief on behalf of himself and those similarly situated, as well as declaratory relief that (1) Coinbase's class action waiver provisions are unenforceable as a matter of law; and (2) Coinbase's onerous arbitration provisions, including the delegation clause purportedly determining the scope of the arbitrator's authority, are procedurally and substantively unconscionable and unenforceable as against Plaintiff and the Class Members.   Plaintiff also seeks actual damages, statutory damages, punitive damages, restitution, and all applicable interest thereon, along with attorneys' fees, costs, and expenses; as well as injunctive relief, including significant improvements to Coinbase's data security systems and protocols (which have been the subject of multiple data breaches), future annual audits, Coinbase-funded long-term credit monitoring services, and any other remedies the Court deems necessary and proper.

## THE PARTIES

9.     Plaintiff is a citizen and resident of the state of Georgia and has been a Georgia resident at all times relevant to this Complaint.   Relying on Coinbase's representations about access to and control over his funds and cryptocurrency,

4

Plaintiff opened an account and a wallet with Coinbase through which he deposited funds and traded cryptocurrency. Consistent with Coinbase's representations, Plaintiff had a reasonable expectation that he would be able to access his account and wallet whenever he wanted. Plaintiff, however, was locked out of his account, freezing the account's buy, sell, trade, and withdraw features.  His demand that Coinbase unfreeze his account went unresolved for an extended period, and his requests for support from Coinbase have been unresolved to Plaintiff's satisfaction. Had Plaintiff known that Coinbase would leave his assets vulnerable to theft and would freeze his account, Plaintiff would not have used Coinbase's service.  As a result of Defendants' acts and inaction, Plaintiff has suffered injury in fact and lost money or property.  Plaintiff desires to continue to maintain his account and wallet with Defendants, provided the misconduct is corrected. Nevertheless, unless and until Defendants correct their misconduct, Plaintiff will be subjected to Defendants' ongoing conduct complained of in this Complaint.

10.     Plaintiff brings this action on behalf of himself, and as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of all persons similarly situated and proximately damaged by the unlawful conduct described herein.

11.     Defendant Coinbase Global, Inc. ("Coinbase Global") is a publicly-traded Delaware corporation that is involved in the business of cryptocurrency exchange, among other interrelated businesses.   Defendant Coinbase Global operates worldwide on a virtual platform and claims not to have a formal physical headquarters since it is a "remote first" company.

12.     Defendant Coinbase, Inc., a Delaware corporation, is a wholly owned subsidiary of Coinbase Global, Inc.   Coinbase Global and Coinbase, Inc. are operated as one corporation.  Coinbase Global maintains its executive offices in San Francisco, California, which are shared with Defendant Coinbase, Inc. Coinbase Global's SEC filings refer to Coinbase Global and Coinbase, Inc. (together with other subsidiaries of Coinbase Global) as "the Company" or "Coinbase."   The founder of Coinbase, Brian Armstrong, is the CEO of both Coinbase and Coinbase Global.  Users have little or no visibility into which entity they are transacting with.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount-in-controversy, exclusive of costs and interests, exceeds the sum of $5,000,000.00, in the aggregate, as there are well over 100 members of the Class, and this is a class action in which at least one member of the proposed class is a citizen of a state different than Defendants.

14.     Pursuant to 28 U.S.C. § 1331, this Court also has federal question subject matter jurisdiction because this Complaint asserts claims under the Electronic Funds Transfer Act, 15 U.S.C. § 1693.

15.     This Complaint also concerns Defendants' violations the Securities Act of 1933 (the "Securities Act") and violations of the Securities Exchange Act of 1934 (the "Exchange Act"). *See* 15 U.S.C. § 77v; 15 U.S.C. § 78aa(a).

16.     This Court has personal jurisdiction over Defendants because, under the provisions of O.C.G.A. §§ 7-1-680 et seq., Coinbase, Inc. is licensed by the State of Georgia Department of Banking and Finance, to engage in the business of Selling Payment Instruments. *See* GA LICENSE# 42796 NMLS# 1163082.  Coinbase, Inc. also routinely conducts business in Georgia, has sufficient minimum contacts in Georgia, and has intentionally availed itself of this jurisdiction by marketing and selling products and services in Georgia.  Coinbase also holds itself out as a "remote-first" company with employees working throughout the United States and in Georgia.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant Coinbase, Inc. conducts a substantial amount of its business in this District, some of the events that give rise to Plaintiff's claims occurred in this District, and Plaintiff resides in this district.

18.     In addition, this Court has personal jurisdiction over Defendants and venue is proper under the nationwide service of process provisions of Section 22 of the Securities Act, 15. U.S.C. § 77v.

## FACTUAL ALLEGATIONS

### Background on Coinbase

19.     Coinbase is an online platform for purchasing, holding, and transferring title to "crypto assets" – otherwise known as "cryptocurrency," "crypto," or "crypto securities"

20.     Coinbase has over 98 million users, in over 100 countries, with $309 billion of cryptocurrency traded quarterly.  As of March 31, 2022, customers entrusted Coinbase's platform with approximately $256 billion in fiat currency and cryptocurrency assets.

21.     Coinbase has not registered as either a securities exchange or as a broker-dealer.

22.     In addition to acting as a cryptocurrency exchange, broker, and dealer, Coinbase provides a "custodial-wallet" for holding cryptocurrency and has participated in the issuance of a prominent digital currency, a so-called "stablecoin," that is tied to the value of the U.S. dollar.

23.     Coinbase account holders can use their accounts to buy, sell, spend, and trade cryptocurrency, such as Bitcoin.  Coinbase explains that assets held in its accounts often are easily used for consumer payments.[1]

24.     In recent years, Coinbase experienced tremendous growth.  The company grew from 199 employees as of December 31, 2017, to 1,717 employees by March 31, 2021, approximately 40% of which work in engineering, product, and design teams.  Its net income catapulted from a loss of $30.4 million in 2019 to positive net income of $3.6 billion in 2021.  Its number of monthly transacting users – retail users who make at least one transaction during a given 28-day period – surged from approximately one million per month at the end of 2019 to approximately 11.4 million two years later, an over 1,000% increase.  Its total number of verified users grew similarly – from a total of approximately 32 million users in 2019 to approximately 98 million users as of March 2022.

25.     Coinbase's user growth has outpaced its ability to provide the account services and protections it promises to consumers.

26.     Before Plaintiff's experience with Coinbase this year, Coinbase was aware it was woefully incapable, understaffed, and overstretched, such that it could

---

[1] https://help.coinbase.com/en/coinbase/getting-started/crypto-education/where-can-i-spend-bitcoin.

not perform its promises and obligations to consumers like Plaintiff. By 2018, Coinbase's customers had submitted at least 134 pages of complaints to the U.S. Securities and Exchange Commission and the California Department of Business Oversight. As another example, in 2019, a Minnesota consumer's Coinbase account was locked due to unauthorized attempts to access it. It took Coinbase six months to conduct a security investigation and restore access to that consumer. *See In the Matter of Coinbase, Inc. License No. MN-MT-1153082*.

27.     Coinbase earns the vast majority of its income, approximately $1.2 billion for the quarter ending March 31, 2022, through fees generated primarily from individual consumers making transactions in cryptocurrency traded on Coinbase's platform. It also earns interest on U.S. currency held in customer accounts.

28.     When Coinbase users make transactions, Coinbase charges consumers substantial transaction fees on cryptocurrency transactions – generally charged as a percentage of the transaction.

29.     Plaintiff and the other members of the Class reasonably believed that Coinbase would provide the safe, secure, and easy-to-access platform it promised.

30.     Plaintiff, like the other Class Members he seeks to represent, has established a wallet (account) hosted by Coinbase that purportedly enables him to conduct transactions in cryptocurrency 24 hours a day, 7 days a week and 365 days

a year.  Each Coinbase customer's account reflects those transactions and permits access to their cash, crypto assets (e.g., cryptocurrencies), and other investment funds.  Accordingly, Plaintiff, and each account holder are entitled to, reasonably expect, and must have access to their wallets at all times.

31.     Coinbase pools the U.S. currency held in customers' "wallets" and places such funds in FDIC insured bank accounts and/or purportedly invests them in liquid investments.  Coinbase keeps the interest and earnings from those funds for itself.  According to Coinbase, this makes cash held with Coinbase insured by the FDIC up to the FDIC's coverage limit, which is currently $250,000.

## Cryptocurrency on Coinbase

32.     In general, cryptocurrency (or "crypto assets" to use a more precise term) is an asset that exists on a digital ledger that records transactions.  The ledger is maintained by the issuer of the cryptocurrency or small group of others. Cryptocurrency (or simply "crypto") is controlled and held by possessing a private cryptographic key, which is a long string of letters and numbers.  That private key unlocks the publicly recorded destination of the crypto on the digital ledger.  An owner of crypto may authorize its transfer with the owner's private key.  A digital ledger system tracks the ownership and transfer of each crypto asset, preventing digital duplication of a crypto asset (such as a Bitcoin).

33.     Crypto assets resemble traditional securities because they represent an investment in a project that is to be undertaken with the funds raised through the sale of the crypto (whether it be a "token," "stablecoin," or cryptocurrency).  Investors purchase crypto with the hope that the crypto's value will appreciate as the issuer creates some use that gives the crypto value.  The crypto may be issued by one individual or small group of individuals who sometimes operate in relative anonymity.[2]

34.     Indeed, some crypto "tokens" are offered to the public in Initial Coin Offerings ("ICOs") modeled on the Initial Public Offerings of for a company.  In ICOs, the supposed value proposition of the ICO is that the issuer will use the funds raised to create and foster a system in which the token is useful, which thereby increases the token's value because it could be sold others eager to participate in the new system.  In practice, the system in which the token is meant be useful is often

---

[2] Even ostensibly "decentralized" crypto assets depend on the efforts of a small group of individuals behaving in a way that will increase the crypto's value and not colluding to destroy its value.  Even the creation (or "mining") of Bitcoin, is dominated by a highly concentrated, small group of individuals.  *See* Igor Makarov and Antoinette Schoar, *Blockchain Analysis of the Bitcoin Market*, NBER Working Paper 29396, available at https://www.nber.org/papers/w29396 (October 2021); Igor Makarov and Antoinette Schoar, *Cryptocurrencies and decentralized finance (DeFi)*, Brookings Papers on Economic Activity, available at https://www.brookings.edu/bpea-articles/cryptocurrencies-and-decentralized-finance-defi/ (March 11, 2022).

never created by the issuer, and ICOs in particular are notorious for being purchased by individuals who have no interest in using the token other than as a means to speculate on its future value.

35.     Therefore, crypto assets offered and traded on Coinbase's exchange are investment contracts and securities, despite sometimes being called "cryptocurrency," because they represent the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others.   Investors invest money by purchasing the crypto. The investors are participating in a common enterprise because their collective purchases fund the creation of the system that will supposedly give value to the crypto they have purchased. They expect profits by reselling the tokens to others at a higher price when the system is created. And they depend on the efforts of others to create that ecosystem.

36.     The Securities and Exchange Commission ("SEC") has concluded that crypto assets may qualify as securities pursuant to the Securities Act and the test in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 294 (1946), and issuers of crypto securities are subject to the registration and reporting requirements of the Securities Act.

37.     Similarly, the SEC concluded that crypto trading platforms may satisfy the meaning of "exchange" as defined by the Exchange Act if they "provide[] users

with an electronic system that matche[s] orders from multiple parties to buy and sell [crypto securities] for execution based on non-discretionary methods."[3]

38.     Coinbase lists on its exchanges crypto that qualifies as investment contracts, and thus securities, in order to earn fees from user transactions in these assets.  Coinbase listed the crypto securities despite knowledge of their status as securities.

39.     Coinbase has received investigative subpoenas and requests from the SEC for documents and information about its customer programs, operations, processes for listing assets, classification of listed assets, staking programs, and stablecoin and yield-generating products.

**Holding and Trading Cryptocurrency on Coinbase**

40.     When an owner of cryptocurrency transfers it, the unique addresses of the transferor and recipient are public, as well as the quantity of assets transferred.

41.     Coinbase users may use Coinbase both to hold and exchange cryptocurrency.

---

[3] Securities and Exchange Commission, *Report of Investigation Pursuant to Section 21(a) of the Securities Act of 1934: The DAO* (Jul. 25, 2017), available at https://www.sec.gov/litigation/investreport/34-81207.pdf.

42.     When a Coinbase user entrusts cryptocurrency with Coinbase, Coinbase typically transfers that cryptocurrency from the deposit address where the user sent it to another address for storage.

43.     Coinbase, not the user, in fact holds the "key" to cryptocurrency placed in a Coinbase account or "wallet."  On May 10, 2022, in a quarterly report filed with the Securities and Exchange Commission, Coinbase disclosed:

> [I]n the event of a bankruptcy, the crypto assets we hold in custody on behalf of our customers could be subject to bankruptcy proceedings and such customers could be treated as our general unsecured creditors. This may result in customers finding our custodial services more risky and less attractive and any failure to increase our customer base, discontinuation or reduction in use of our platform and products by existing customers as a result could adversely impact our business, operating results, and financial condition.

Coinbase Global, Inc., Quarterly Report (Form 10-Q), at 83 (May 10, 2022).

44.     The "Coinbase Platform" allows users to place market orders – orders to buy, sell, or trade crypto at the crypto's market price displayed on the Coinbase Platform at the time the user places the order.

45.     The "Coinbase Pro Platform" offers users three trading options associated with brokers and electronic trading platforms for traditional securities: market orders, limit orders, and stop orders.

46.     Trades on Coinbase's exchanges do not happen directly between users but between a user a Coinbase.  There is no privity between buyers and sellers on

Coinbase.  The exchanges Coinbase operates are what are known as "centralized exchanges."

47.   For example, in a cryptocurrency trade between Coinbase users, Coinbase debits the seller's account and then credits the seller's account.  The cryptocurrency is not transferred on the public digital ledger (blockchain) for cryptocurrency.  Rather, the only actual transactions are between the seller and Coinbase, on the one hand, and the buyer and Coinbase, on the other hand.

48.   When a user withdraws or transfers his or her cryptocurrency outside of Coinbase, the user provides Coinbase with the destination address for the cryptocurrency.  Next, the exchange debits the user's account and transfers a corresponding amount of cryptocurrency from Coinbase's centralized reserves to that address.  In other words, the withdrawn assets come from the centralized exchange.

### Coinbase Misleads Customers About Account Security

49.   Coinbase holds itself out as providing the primary financial account for the crypto economy – a safe, trusted, and easy-to-use platform to invest, store, spend, earn, and use crypto assets. For example, Coinbase's website states that it is the "most trusted" and "most secure" cryptocurrency platform and that assets held

online are protected by an "extensive insurance policy."[4]  Coinbase represents that it offers users the opportunity to participate in "a more fair, accessible, efficient, and transparent financial system enabled by crypto."[5]

50.    In January 2022, for example, Coinbase's security page assures consumers that it follows "Payment Industry Best Practices," takes "careful measures to ensure your bitcoin is as safe as possible," and that "Online Funds Are Now Covered by Insurance."  Only on a subsequent page did Coinbase reveal its insurance policy "does not cover any losses resulting from unauthorized access to your personal Coinbase or Coinbase Pro account(s) due to a breach or loss of your credentials."  And, in Coinbase's annual report for 2021, Coinbase reveals that, even if its insurance coverage were to ever apply to a consumer's loss, it is underinsured: the "total value of crypto assets in our possession and control is significantly greater than the total value of insurance coverage that would compensate us in the event of theft or other loss of funds…"

51.    Coinbase represents to customers that it is a fully compliant, regulated entity, registered as a Money Services Business with FinCEN, the United States Department of the Treasury's Financial Crimes Enforcement Network.

---

[4] https://www.coinbase.com/security.
[5] https://www.coinbase.com/about.

52.     Coinbase also represents to consumers that it is licensed by the Georgia Department of Banking and Finance as a seller of payment instruments, along with holding similar money transmitter licenses in other states.

53.     Coinbase is obligated by law to establish and maintain adequate cybersecurity measures.  Coinbase recently described its obligations as "bank-level security standards:"

> We deposit, transfer, and custody customer cash and crypto assets in multiple jurisdictions. In each instance, **we are required to safeguard customers' assets using bank-level security standards** applicable to our wallet and storage systems, as well as our financial management systems related to such custodial functions.

Coinbase Global, Inc., Quarterly Report (Form 10-Q), at 83 (May 10, 2022) (emphasis added).

54.     Coinbase recognizes the responsibilities, risks, and liabilities it undertakes holding its customers' valuable financial assets.  For example, Coinbase made the following statement in its Supplement No. 1 to its April 1, 2021, prospectus filed with the Securities and Exchange Commission:

> The Company has committed to securely store all crypto assets it holds on behalf of users. As such, the Company may be liable to its users for losses arising from theft or loss of user private keys. The Company has no reason to believe it will incur any expense associated with such potential liability because (i) it has no known or historical experience of claims to use as a basis of measurement, (ii) it accounts for and continually verifies the amount of crypto assets within its control, and (iii) it has established security around custodial private keys to minimize the risk of theft or loss. Since the risk of loss is remote, the

Company had not recorded a liability at March 31, 2021 or December 31, 2020.

55.     Coinbase also made the following statement in its Supplement No.1:

"Our Business involves the collection, storage, processing, and transmission of confidential information, customer, employee, service provider, and other personal data, as well as information required to access customer assets. We have built our reputation on the premise that our platform offers customers a secure way to purchase, store, and transact in crypto assets."

56.     Later, in its 10-K annual report for 2021, Coinbase admitted it had flawed data security measures and that it is a target for hackers:

[I]n 2021, third parties independently obtained login credentials and personal information for at least 6,000 customers and used those credentials to exploit a vulnerability that previously existed in the account recovery process. Coinbase reimbursed impacted customers approximately $25.1 million.

57.     In response to questions about scammers and bad actors taking advantage of Coinbase users, Coinbase's Chief Security Officer, Philip Martin, acknowledged that "some bad actors are going to get on [Coinbase]." When pressed on Coinbase's security flaws that leave users accounts vulnerable to financial ruin, he acknowledged: "I'm not going to sit here and say Coinbase Wallet has the perfect [user interface]. Are there improvements we could make? Absolutely. And we will continue to do so."[6]

---

[6] *See* https://www.washingtonpost.com/technology/2022/04/04/crypto-scams-

58.     As disclosed in its privacy policy, Coinbase collects detailed personal data on its users.[7]  And Coinbase monetizes the user data it collects.  In particular, Coinbase sold detailed user and transaction data and analytics software – including location data – to the Immigrations and Customs Enforcement.[8]

59.     As Plaintiff's experience shows, Coinbase uses the detailed personal data it collects to enrich itself, yet Coinbase does not use that data for the benefit of consumers, whose location data could be used to detect and prevent unauthorized activity in Coinbase users' accounts.

60.     Coinbase's cybersecurity and customer support measures are currently subject to an investigation by the New York Department of Financial Services.

**Coinbase's "User Agreement"**

61.     Coinbase claims to bind its users, such as Plaintiff and Class Members, to a lengthy "User Agreement" when they create their account and wallet with Coinbase.

62.     Although that User Agreement contains an arbitration provision, there are a number of cumbersome conditions precedent that must be met before Coinbase customers can arbitrate their disputes with Defendants.   Defendants require

---

coinbase-liquidity-mining/.
[7] https://www.coinbase.com/legal/privacy.
[8] https://theintercept.com/2022/06/29/crypto-coinbase-tracer-ice/.

customers to first use its "support team." If the customer and Defendants fail to resolve the dispute in that manner, then customers must utilize Defendants' "Formal Complaint Process."  If that fails to resolve the customer's dispute, only then can customers attempt to resolve disputes through arbitration.   But Coinbase systemically fails to follow those pre-arbitration dispute resolution mechanisms as set forth in the User Agreement, thereby rendering the provision, including its delegation provision, void as to Plaintiff and Class Members.

63.     Coinbase knew, or should have known, that when presenting Plaintiff and Class Members with its User Agreement, that Coinbase did not have adequate staffing or adequate policies, practices and procedures in place to follow its mandated pre-arbitration dispute resolution procedures incorporated into, and a pre-requisite for, the Arbitration provision in the User Agreement.  Indeed, Coinbase has even disclosed that its "phone agents" do not take support calls for many types of customer inquiries.

64.     Coinbase entered into the User Agreement knowing it would breach the requirements of the User Agreement's dispute resolution process.

65.     Accordingly, Coinbase misrepresented its ability to comply with its own arbitration procedures and fraudulently induced Plaintiff and Class Members to

accept the dispute resolution clause, including the provision delegating arbitrability and the contract's validity to the arbitrator.

66.     The User Agreement's dispute resolution process is procedurally unconscionable.  Moreover, the procedural unconscionability of the User Agreement is expressly incorporated in the User Agreement's unusual "delegation clause" that "decides who decides" disputes.  The delegation clause imposes an onerous, unfair, and unusual burden on users because the delegation clause itself is subject to the multi-step, onerous dispute resolution process in the User Agreement.

67.     Further, the cumbersome, onerous dispute resolution process in Coinbase's User Agreement (including the delegation clause specifically) is one-sided and lacks mutuality.  The long, multi-step process of contacting Coinbase's "support team" and using the "Formal Complaint Process" only applies to claims users seek to make against Coinbase.  Coinbase is not subject to those obstacles.

68.     Because Coinbase is immune from the pre-arbitration hoops it set in front of users, the User Agreement does not require Coinbase to arbitrate its claims against users.

69.     The User Agreement (and, specifically, the delegation clause of the dispute resolution provision) is also unenforceable because it is in violation of federal securities laws.

70.     Section 5 of the Exchange Act makes it "unlawful for any broker, dealer, or exchange, directly or indirectly, to make use of the mails or any means or instrumentality of interstate commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction of the United States to effect any transaction in a security . . . unless such exchange (1) is registered as a national securities exchange . . . , or (2) is exempted from such registration." 15 U.S.C. § 78e.

71.     Coinbase operates an exchange because it provides a market and facilities for bringing together purchasers and sellers of crypto securities.  Crypto securities are securities within the meaning of Section 2(a)(1) of the Securities Act. 15 U.S.C. § 77b(a)(1).

72.     Coinbase has never registered as a national securities exchange, as it is required to do.  Therefore, Coinbase operates unregistered exchanges in violation of the Exchange Act.

73.     In addition, Section 15(a)(1) of the Exchange Act makes it unlawful "for any broker or dealer … to make use of … any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security … unless such broker or dealer is registered in accordance with subsection (b) of this section." 15 U.S.C. § 78o(a)(1).  A "broker" includes an entity "engaged in the business of effecting transactions in securities for

the account of others." 15 U.S.C. § 78c(a)(4)(A).  A "dealer" includes an entity "engaged in the business of buying and selling securities … for such person's own account," insofar as such transactions are part of that person's "regular business." 15 U.S.C. § 78c(a)(5).

74.   Coinbase has operated as a broker by facilitating the sale of crypto securities.

75.   Coinbase has operated as a dealer by holding itself out as willing to buy/sell securities on a continuous basis, willing to provide liquidity to the, market for digital assets, having regular customers, maintaining custody over customers' crypto securities, providing customers with access to services allowing purchase of crypto on credit, having a regular turnover inventory of crypto securities, purchasing crypto for accounts in Coinbase's own name (often at a discount to the price in ICOs), and selling crypto from its inventory to investors for profit.

76.   Coinbase has not registered as a broker or dealer.  Thus, it has operated as an unregistered broker-dealer in violation of the Exchange Act.

77.   Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter . . . and every contract (including any contract for listing a security on an exchange) . . . the performance of which involves the violations of, or the continuance of any

24

relationship or practice in violation of, any provision of this chapter . . . shall be void

. . . as regards the rights of any person who, in violation of any such provision, . . .

shall have made or engaged in the performance of any such contract." 15 U.S.C.

§ 78cc(b).

78.    In conclusion, the User Agreement is unenforceable against Plaintiff

and Class Members because, among other reasons, it is a contract in violation of the

Exchange Act.

**Plaintiff's Coinbase Account**

79.    In January 2022, Plaintiff opened up a Coinbase account and transferred

money from his bank account to purchase approximately $6,000 of cryptocurrency.

80.    Plaintiff held the cryptocurrency in his Coinbase account or "wallet."

81.    Coinbase did not protect Plaintiff's account by implementing adequate

and standard security measures to prevent fraudulent account access, detect

fraudulent activity, and remediate the fraudulent activity.

82.    Around April 2022, Plaintiff received an email purporting to be from

Coinbase requesting that he change his password for security purposes.  Plaintiff

attempted to change his password according to the provided instructions.

83.    After his attempt to change his Coinbase password, around April 28,

2022, nearly $6,000 worth of cryptocurrency was drained from Plaintiff's Coinbase

account and transferred to unknown parties or "wallets" Plaintiff had never before interacted with.

84.    Coinbase authorized the complete depletion of Plaintiff's account – an activity inconsistent with Plaintiff's previous activity on his Coinbase account.

85.    Coinbase failed to delay the processing or execution of the above suspicious activity on Plaintiff's account.

86.    Coinbase-authorized unknown parties also attempted to purchase additional cryptocurrency "on margin," that is with money borrowed from Coinbase.

87.    On April 28, 2022, Coinbase allowed the hackers who breached Plaintiffs' Coinbase account to withdraw $1,000 from Plaintiff's bank account.

88.    Coinbase made that $1,000 available for immediate use by the hackers, who purchased $1,000 in cryptocurrency using Plaintiffs' funds.

89.    Plaintiff did not authorize the complete depletion of his account nor the $1,000 withdrawal from his bank account.

90.    Hours later, at Plaintiff's request, Plaintiff's bank reversed the unauthorized transfer of $1,000 to Coinbase.

91.    Coinbase then froze Plaintiff's account and treated it as having a negative balance.

92.   Coinbase later recovered nearly all of the $1,000 used to make the unauthorized purchase of cryptocurrency on April 28, 2022.

93.   However, Coinbase refused to cover all the cryptocurrency that was stolen from Plaintiff's account.

94.   On May 3, 2022, Plaintiff filed a formal complaint with Coinbase regarding unauthorized access to Plaintiff's account.

95.   On or about May 21, 2022, Plaintiff received an automated email response from Defendants stating:

"Hello,

Thanks for filing a Formal Complaint with Coinbase.

The Disputes Team is currently looking into your Complaint and we require some additional time to fully investigate and respond to you. Please allow up to 20 business days to fully investigate your complaint and provide you with a Resolution Notice.

Thanks for your patience, we will provide you with a response as soon as possible.

Thank you,
Coinbase Support.

96.   On June 24, 2022, Coinbase sent Plaintiff another form email rejecting his complaint and refusing to reimburse him for the unauthorized transactions.

97.   In rejecting Plaintiff's complaint, Coinbase admitted the unauthorized transfers from Plaintiff's account on April 28, 2022, were from an IP address that

has never been associated with Plaintiff and was located far away from the physical location and IP address from which Plaintiff always accessed his account.

98.     Defendants could have easily identified and prevented losses from the unauthorized activity on Plaintiff's account.  There were several obvious red flags signaling to Coinbase suspicious activity and a risk of theft, including the fact that the activity was from a new IP address in new location that had never before been used by Plaintiff.  Moreover, the new IP address was associated with a location far away from Plaintiff's home, the usual location from which he accessed Coinbase, and the location of Plaintiff's cell phone at the time of the account breach – all locations Coinbase knew or could readily determine.

99.     Coinbase falsely lulled Plaintiff and Class Members into believing their accounts were secure with Coinbase, protected by Coinbase's purportedly strong security measures, and even insured against losses.  In fact, Coinbase left Plaintiff and Class Members vulnerable to hackers and third-party bad actors.  Had adequate cybersecurity protections been in place, the unauthorized access, unauthorized transfer of cryptocurrency, unauthorized wire of funds from Plaintiff's bank, and freezing of Plaintiff's account would not have occurred.

100.   Coinbase's authorization of the immediate depletion of Plaintiff's entire account and additional purchase of cryptocurrency were inconsistent with industry standards.

101.   As a result, Plaintiff and Class Members have been damaged by the lack of access to their accounts, loss of funds, loss of cryptocurrency assets, deprived of the use of their funds and accounts preventing them from engaging in any authorized transactions including but not limited to, investing, spending, saving, earning, using, selling or withdrawing their cryptocurrencies, and related injuries.

102.   Defendants' actions have irreparably harmed Plaintiff and Class Members.

## **CLASS ACTION ALLEGATIONS**

103.   Plaintiff brings this action pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of himself and the following class (collectively, the "Class"):

> All current and former Coinbase accountholders and/or customers who maintained assets, such as crypto assets, in a Coinbase account, and who subsequently lost or were deprived access to their assets, their Coinbase account, and/or their personal data.

104.   The following individuals and entities are excluded from the proposed

Class:

> Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to its departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

105.   The proposed Class meets the requirements of Fed. R. Civ. P. 23(a),

(b)(1), (b)(2), (b)(3), and (c)(4).

106.   Plaintiff has no interests antagonistic to those of the Class.

107.   **Numerosity:** There are approximately 98 million Coinbase users. The

proposed Class is believed to be so numerous that joinder of all members is

impracticable.  Upon information and belief, the total number of Class Members is

in the millions of individuals.  Membership in the Class will be determined by

analysis of Defendants' records.

108.   **Typicality:** Plaintiff's claims are typical of the claims of the Class. All

such claims arise out of the same policies, practices, procedures, and other actions

by Defendants, and the same or similar documents used by Defendants in their

dealings with Plaintiffs and Class Members. Plaintiff and all members of the Class

were injured through Defendants' uniform misconduct, negligence, and breaches of duty.

109. **Adequacy:** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class that he seeks to represent; Plaintiff has retained counsel competent and highly experienced in class action litigation; and Plaintiff and Plaintiff's counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

110. **Superiority:** A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiff and the Class. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult, if not impossible, for members of the Class individually to effectively redress Defendants' wrongdoing. Even if Class members could afford such individual litigation or even individual arbitration, the court system could not. Individualized litigation and/or arbitration presents a potential for wholly inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer

management difficulties and provides benefits of single adjudication, economy of scale, and comprehensive supervision by a single forum.

111. **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include:

a. Whether Defendants owed duties to Plaintiff and the Class, the scope of those duties, and whether Defendants breached those duties;

b. Whether Defendants' conduct was unfair or unlawful;

c. Whether Defendants engaged in deceptive conduct;

d. Whether Defendants engaged in the wrongful conduct alleged herein;

e. Whether Defendants have converted the funds belonging to Plaintiff and the Class;

f. Whether Defendants have been unjustly enriched as a result of their conduct of locking out Plaintiff and the Class from their Coinbase accounts;

g. Whether Plaintiff and the Class are entitled to damages, equitable relief and other relief as a result of Defendants' wrongful conduct;

h. Whether Defendants were aware of and failed to adequately respond to security issues, including failing to diligently investigate issues and expediently notify affected individuals in, and whether this caused damages to Plaintiff and the Class;

i. Whether Plaintiff and the Class suffered injury as a proximate result of Defendants' negligent actions or failures to act; and

j. Whether declaratory and injunctive relief are appropriate and, if so, what injunctive relief is necessary to redress the imminent and currently ongoing harm faced by Plaintiff and Class members and the public; and

k. Whether Plaintiff and Class members are entitled to treble and punitive damages.

112.  This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members and making final declaratory and injunctive relief appropriate with respect to the Class in its entirety. Defendants' policies challenged herein apply to and affect Class members uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class in its entirety, not on facts or law applicable only to the Plaintiff.

113.  Unless a Class-wide injunction is issued, Defendants may continue in their failure to properly secure the accounts of Class Members, and Defendants may continue to act unlawfully as set forth in this Complaint.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### (Declaratory Judgement as to Invalidity of Arbitration Provision and Delegation Clause)

114.   Plaintiff incorporates by reference and realleges paragraphs 1 to 113 contained above, as though fully set forth herein.

115.   Coinbase has attempted to immunize itself from liability for its wrongful conduct by burying a purported arbitration agreement and class action waiver in a "User Agreement."

116.   Coinbase's purported arbitration agreement, including the delegation clause, and class action waiver are unenforceable because they violate public policy and are both procedurally and substantively unconscionable.

117.   Specifically, both the arbitration clause and its delegation clause in the User Agreement lack mutuality and impose an unfair burden on Plaintiffs that qualifies as unconscionable.

118.   The User Agreement includes pretextual and unduly onerous preconditions to arbitration.

119.   Coinbase's complaint process is ineffective, unavailing, and one-sided, requiring users to jump through antecedent hoops (not applicable to Coinbase) before initiating arbitration.

34

120.   At least one court has already determined that both the arbitration clause and its delegation clause in Coinbase's Terms of Service are unconscionable and unenforceable. *See Bielski v. Coinbase, Inc.*, 2022 WL 1062049 (N.D. Ca. April 8, 2022).

121.   A judicial declaration is necessary and appropriate so the parties may ascertain their rights, duties, and obligations with respect to these provisions.

122.   The Court may use its equitable powers to declare the arbitration agreement and class action waiver in Coinbase's User Agreement to be unenforceable.

123.   Accordingly, Plaintiff and the Class are entitled to a declaration that the arbitration clause, including the delegation clause, in the Coinbase User Agreement (if such User Agreement is found to exist) are unconscionable and unenforceable as to Plaintiff and as to the Class.

## SECOND CAUSE OF ACTION
### (Breach of Fiduciary Duty)

124.   Plaintiff incorporates by reference and realleges paragraphs 1 to 113 contained above, as though fully set forth herein.

125.   As the custodian of their cryptocurrency assets and acting as an agent transacting on their behalf when they wish to buy, sell, or convert crypto assets on the Coinbase platform, Coinbase has a fiduciary relationship with Plaintiff and Class

35

Members, and must exercise the fiduciary duties it therefore owes with the utmost good faith, integrity, and in the best interest of Plaintiff and Class Members.

126.   As discussed herein, Coinbase represents and agrees that it will act as the custodian of all funds and digital currency assets it holds in its customer accounts, that Coinbase will securely store these funds and cryptocurrency assets, that Coinbase will hold these funds and cryptocurrency assets for the benefit of Plaintiff and Class Members, that Coinbase will allow Plaintiff and Class Members to control, access and withdraw their funds and cryptocurrency assets at any time, and that Coinbase will not sell, transfer, loan, hypothecate, or otherwise alienate customer cryptocurrency assets except as instructed by the customer.

127.   As the custodian of their valuable assets, Plaintiff and Class Members entrust Coinbase to ensure the safekeeping of their assets and to provide them with access to and control over their accounts and the assets within those accounts when they want.

128.   Defendants owe a fiduciary duty to Plaintiff and Class Members to provide them with immediate access to their accounts, the funds and cryptocurrency assets within those accounts, and to process only the respective customer's transactions within those accounts.

129.   Defendants owe a fiduciary duty to Plaintiff and Class Members to protect their accounts, their transactions relating to those accounts, and their funds and cryptocurrency assets within those accounts.

130.   Defendants owe a fiduciary duty to Plaintiff and Class Members to timely respond to and resolve their complaints regarding security threats, hacking, and technological issues that preclude Plaintiff's and Class Members' access to their accounts, account transactions, account funds, and cryptocurrency assets.

131.   Defendants owe a fiduciary duty to timely notify Plaintiff and Class Members of any security threats, hacking, and technological issues that preclude Plaintiff's and Class Members' access to their accounts, account transactions and account funds and cryptocurrency assets.

132.   Defendants breached their fiduciary duty owed to Plaintiff and Class Members to protect their accounts, their transactions relating to those accounts, and their funds and cryptocurrency assets within those accounts.

133.   Defendants breached their fiduciary duty owed to Plaintiff and Class Members to timely respond to and resolve their complaints regarding security threats, hacking, and technological issues that preclude Plaintiff's and Class Members' access to their accounts, account transactions and account funds and cryptocurrency assets.

134.   Defendants breached their fiduciary duty owed to timely notify Plaintiff and Class Members of any security threats, hacking, and technological issues that preclude Plaintiff's and Class Members' access to their accounts, account transactions, account funds, and cryptocurrency assets.

135.   Defendants breached their fiduciary duty owed to properly employ standard measures to verify the identity of users, including Plaintiff and Class Members, to reduce the risk of security threats, hacking, and technological issues that led to Plaintiff's and Class Members' loss of assets and loss of access to their accounts.

136.   Defendants breached their fiduciary duties owed to Plaintiff and Class Members by, among other things, actively preventing Plaintiff and Class Members from accessing their accounts, accessing the funds and cryptocurrency assets within those accounts, processing transactions within Plaintiff's and Class Members' accounts when not initiated by Plaintiff and Class Members, locking Plaintiff and Class Members out of their accounts, and/or refusing to return Plaintiff's and Class Members' funds to Plaintiff and Class Members.

137.   Defendants also breached their fiduciary duties owed to Plaintiff and Class Members by failing to act with utmost good faith and in the best interests of Plaintiff and Class Members by, among other things, ignoring or failing to timely

respond to and resolve Plaintiff's and Class Members' repeated complaints and other communications demanding access to their Coinbase accounts.

138.   As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiff and Class Members have been damaged in an amount to be proven at trial, including nominal damages.

139.   In addition to actual or consequential damages, Plaintiff and Class Members are entitled to pre-judgment interest, attorney's fees and costs, along with any relief that this Court deems just and proper.

### THIRD CAUSE OF ACTION
### (Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing)

140.   Plaintiff incorporates by reference and realleges paragraphs 1 to 113 contained above, as though fully set forth herein.

141.   Plaintiff and Class Members each entered into a written contract, the User Agreement, with Defendants upon their registration for a Coinbase account. Plaintiff and Class Members were presented with the User Agreement on a take-it-or-leave it basis and had no opportunity to negotiate any of the specific terms or provisions thereunder.

142.   Every contract, including the User Agreement, contains an implied duty of good faith and fair dealing. Defendants entered into and are bound by the User

Agreements with Plaintiff and Class Members, which are valid and enforceable contracts that contain an implied duty of good faith and fair dealing.

143.   Defendants breached the User Agreement and the implied covenant of good faith and fair dealing by, among other things, failing to discharge their obligations and provide the services they promised in exchange for the transaction fees they charged Plaintiff and Class Members for each transaction in their account and for the monies they earned on the funds within Plaintiff's and Class Members' accounts.

144.   Defendants breached the User Agreement and the implied covenant of good faith and fair dealing by failing to protect Plaintiff's and Class Members' accounts, their transactions relating to those accounts, and their funds and cryptocurrency assets within those accounts.

145.   Defendants breached the User Agreement and the implied covenant of good faith and fair dealing by failing to timely respond to and resolve Plaintiff's and Class Members' complaints regarding security threats, hacking, and technological issues that precluded Plaintiff and Class Members' access to their accounts, account transactions, account funds, and cryptocurrency assets.

146.   Defendants breached the User Agreement and the implied covenant of good faith and fair dealing by failing to return Plaintiff's and Class Members' account funds and cryptocurrency assets.

147.   As a result of Defendants' breach of their contractual duties, obligations and/or promises arising under the User Agreement and the implied covenant of good faith and fair dealing, Plaintiff and Class Members were damaged by, including but not limited to, their payment of transaction fees, the loss of use of their accounts, the inability to access the funds and cryptocurrency assets in their accounts and the loss of value of those assets, all in an amount to be proven at trial.

148.   In addition to Plaintiff's and Class Members' actual contract damages, Plaintiff and Class Members seek recovery of their attorney's fees, costs to the extent provided by the User Agreement and pre-judgment interest.

## FOURTH CAUSE OF ACTION
### (Unjust Enrichment)

149.   Plaintiff incorporates by reference and realleges paragraphs 14-60, 79-113 contained above, as though fully set forth herein.

150.   Plaintiff and Class Members conferred a benefit upon Defendants by depositing their currency funds and cryptocurrency assets into their accounts maintained by Defendants and maintained such assets in those accounts, which enabled Defendants to profit from the investment and trading of such assets.

41

151.   Plaintiff and Class Members conferred a benefit upon Defendants by paying fees to Defendants in order to conduct transactions in their accounts, maintain their accounts, and have access to those accounts.

152.   As a result of Defendants' actions and omissions alleged herein, Defendants have been unjustly enriched at the expense of Plaintiff and Class Members. Under principles of equity and good conscience, Defendants should not be permitted to retain the transaction fees paid by Plaintiff and Class Members or the assets held within Plaintiff's and Class Members' accounts.

153.   Plaintiff and Class Members are entitled to restitution of, disgorgement of, and/or the imposition of a constructive trust upon all fee revenue, income, profits, and other benefits obtained by Defendants at the expense of Plaintiff and Class Members resulting from Defendants' actions and/or omissions alleged herein, all in an amount to be proven at trial. Plaintiff and Class Members also are entitled to attorney's fees, costs and prejudgment interest, along with any relief that this Court deems just and proper.

154.   Plaintiff and the Class have no adequate remedy at law.

## FIFTH CAUSE OF ACTION
### (Deceptive Practice – O.C.G.A. § 10-1-393)

155.   Plaintiff incorporates by reference and realleges paragraphs 1 to 113 contained above, as though fully set forth herein.

42

156.   Coinbase Global and Coinbase Inc. are each a "person" as defined by the Georgia Fair Business Practices Act ("Georgia FBPA"). O.C.G.A. § 10-1-392(a)(24).

157.   Plaintiffs and Class Members are "consumers" within the meaning of the Georgia FBPA. O.C.G.A. § 10-1-392(a)(6).

158.   The opening of an account and placing assets with Coinbase by Plaintiffs and Class Members constituted "consumer transactions" as defined by the Georgia FBPA. O.C.G.A. § 10-1-392(a)(10).

159.   The Georgia FBPA declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, O.C.G.A. § 10-1-393(a), including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, or benefits that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," id. §§ 10-1-393(b)(5), (7) & (9).

160.   Defendants' acts and practices as alleged herein also constitute "unfair" and "deceptive" acts and practices within the meaning of the Georgia FBPA.  In the course of conducting business, Defendants have violated the Georgia FBPA's

proscription against unfair business practices by, among other things: (a) improperly and unreasonably preventing Plaintiff and Class Members from accessing their accounts and funds, either for extended periods of time or permanently; (b) failing to timely respond to requests for support; (c) failing to preserve and safeguard customer funds as represented and is standard practice; (d) not compensating Plaintiff and Class Members for Defendants' wrongdoing and their losses; and (e) misleading consumers about the security of assets entrusted to Coinbase.

161.   Defendants' unfair business conduct is substantially injurious to consumers, offends legislatively-declared public policy as announced by the violations of the laws alleged, and is immoral, unethical, oppressive, and unscrupulous. The gravity of Defendants' wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Defendants' legitimate business interests other than engaging in the above-described wrongful conduct.

162.   Plaintiff, in fact, has been deceived as a result of his reliance of Defendants' material representations and omissions, which are described above and would be considered important to any reasonably consumer.

163.   As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Plaintiff and Class Members suffered and will continue to suffer actual

damages in that they have lost assets entrusted to Coinbase and wasted time in Coinbase's cumbersome, unfair, and futile complaint process, among other damages.

164.   Defendants' violations present a continuing risk to Plaintiff and to the general public.  Defendants' unlawful acts and practices affect the public interest.

165.   Plaintiff and Class Members are entitled to equitable relief.

166.   Defendants received proper notice of their alleged violations of the Georgia FBPA via Plaintiff's written complaints to Coinbase.  Plaintiff found the response to his notice to Coinbase to be unsatisfactory.

167.   Thus, pursuant to O.C.G.A. § 10-1-399, Plaintiff seeks, in addition to equitable relief, actual and statutory damages, attorneys' fees and expenses, treble damages, and punitive damages as permitted under the Georgia FBPA and applicable law.

## SIXTH CAUSE OF ACTION
### (Violations of the Electronic Funds Transfer Act and Regulation E)

168.   Plaintiff incorporates by reference and realleges paragraphs 1 to 113 contained above, as though fully set forth herein.

169.   Congress created the Electronic Funds Transfers Act ("EFTA"), 15 U.S.C. § 1693, et seq., in order to establish a framework to regulate electronic fund

and remittance transfer systems, and to establish individual consumer rights related to electronic fund transfers.

170.    Regulation E is promulgated pursuant to the EFTA.  It governs how financial institutions must provide information and investigate an unauthorized electronic fund transfer. See, e.g., 12 C.F.R. § 1005.11; 12 C.F.R. 205.11.

171.    The EFTA provides, in relevant part: if a financial institution receives notice (or constructive notice) of an error (e.g. an unauthorized electronic fund transfer) within sixty days of sending a consumer notice of an electronic funds transfer, that financial institution must timely investigate the alleged error and timely report to the consumer the results of its investigation and determination as to whether an error occurred.  See 15 U.S.C. § 1693f(a); 12 C.F.R § 205.11; 12 C.F.R. Pt. 205, Supp. I.

172.    "If the financial institution determines that an error did occur, it shall promptly, but in no event more than one business day after such determination, correct the error, subject to section 1693g of this title, including the crediting of interest where applicable."  15 U.S.C. § 1693f(b).

173.    In an action under 15 U.S.C. § 1693(b), a financial institution may be subject to treble damages if the court finds that:

> **(1)** the financial institution did not provisionally recredit a consumer's account within the ten-day period specified in

46

subsection (c), and the financial institution (A) did not make a good faith investigation of the alleged error, or (B) did not have a reasonable basis for believing that the consumer's account was not in error; or

**(2)** the financial institution knowingly and willfully concluded that the consumer's account was not in error when such conclusion could not reasonably have been drawn from the evidence available to the financial institution at the time of its investigation[.]

15 U.S.C. § 1693f(e).

174.   Coinbase is a financial institution as defined by the EFTA because it holds Plaintiff and Class Members' accounts with digital and/or fiat currencies.

175.   Plaintiff is a consumer under the EFTA.

176.   Class Members' accounts are "accounts" as defined by the EFTA and/or Regulation E because they are asset accounts held directly by Coinbase and established primarily for personal, family, or household purposes. Class Members' accounts are used for such personal purposes – i.e., intended to earn income from appreciating assets and/or make purchases – and not for business purposes.

177.   Coinbase failed to conduct an investigation that complied with the EFTA and Regulation E.

178.   Coinbase failed to correct the errors, *i.e.* the unauthorized electronic fund transfers, in Plaintiff's and Class Members' accounts by timely crediting (and/or provisionally crediting) their accounts for the amount drained.

179.   Given the telltale signs of theft from Plaintiff's account (and indeed from numerous other users of Coinbase's platform), Coinbase could not reasonably have concluded the unauthorized transactions in Plaintiff's Coinbase account were not in "error."

180.   Accordingly, pursuant to 15 U.S.C § 1693f, Plaintiff and Class Members are entitled to compensatory damages, treble damages, attorneys' fees, and costs of the action.

### SEVENTH CAUSE OF ACTION
### (Negligence)

181.   Plaintiff incorporates by reference the allegations in paragraphs 1 to 113 above as though fully set forth herein.

182.   At all times herein relevant, Defendants owed Plaintiff and Class Members as a duty of care, inter alia, to act with reasonable care to secure and safeguard assets held in their Coinbase accounts and to safeguard the sensitive information stored in those accounts, including by establishing and maintaining measures that comply with highest standards of cryptocurrency, standards for money transmitters and financial institutions, laws, regulations, and Coinbase's own internal policies.   Defendants undertook this obligation and assumed these responsibilities upon accepting Plaintiff's and Class Members' assets, such as cryptocurrency, on its platform.

183.   Coinbase held itself out to be a highly secure platform for holding cryptocurrency and in full compliance with the stringent requirements of state and federal authorities.

184.   As more fully set forth above, Coinbase's negligent actions include:

a. Failing to implement and monitor adequate cybersecurity measures to protect its users against rampant hacking and theft on its platform;

b. Failing to detect suspicious activity in Plaintiff's account;

c. Authenticating a new device never before used by Plaintiff;

d. Authenticating access to Plaintiff's account from a location far away from Plaintiff's actual location;

e. Failing to provide adequate customer support services to remedy unauthorized account access;

f. Authorizing the complete depletion of Plaintiff's account;

g. Failing to timely detect and mitigate suspicious activity in and subsequent theft from Plaintiff's account; and

h. Failure to insure or recover Plaintiff's losses.

185.   Defendants breached their duty to Plaintiff and Class Members by providing cryptocurrency custody and brokerage services that failed to meet the applicable standard of care.

186.   Plaintiff and Class Members have incurred substantial financial damages as a direct result of Defendants' breach of duty of reasonable care.

187.   Plaintiff and Class Members have also incurred costs in terms of time, effort, and money expended as a result of Defendants' breach, insufficient customer support, and invalid and onerous dispute resolution process.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment against Defendants as follows:

a. An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff is a proper representative of the Class requested herein;

b. A judgment in favor of Plaintiff and the Class awarding them appropriate monetary relief, including actual and statutory damages, punitive damages, attorney fees, expenses, costs, and such other and further relief as is just and proper;

c.  An order for declaratory and injunctive relief and for money damages under Federal Rules of Civil Procedure Rule 23, appointing Plaintiff as Class Representative, and appointing his attorneys as Class Counsel;

d.  A judgment for actual damages;

e.  A judgment for compensatory damages;

f.  A judgment for disgorgement of transaction fees, income and other profits;

g.  A judgment for injunctive relief enjoining Defendants from engaging in future unlawful activities complained of herein, including violations of O.C.G.A. § 10-1-393;

h.  An order that Defendants shall engage in corrective actions so that customer accounts, funds and cryptocurrency assets can be secured, accessed and transacted;

i.  An accounting of all amounts that Defendants unjustly received, retained, and/or collected as a result of their unlawful acts and omissions;

j.  A judgment for exemplary and punitive damages for Defendants' knowing, willful, and/or intentional conduct;

k.  Pre-judgment and post-judgment interest;

l.  A judgment for reasonable attorney fees and costs of this suit, pursuant

to O.C.G.A. § 10-1-393, and any other applicable statute; and

m.  A judgment for all such other and further relief as the Court deems

equitable

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

DATED: August 15, 2022          HERMAN JONES LLP

By: */s/ John C. Herman*
John C. Herman
  (Ga. Bar No. 348370)
Serina M. Vash (to seek admission pro hac vice)
  (NJ Bar No. 402620)
3424 Peachtree Road, N.E., Suite 1650
Atlanta, Georgia 30326
Telephone: (404) 504-6500
Facsimile: (404) 504-6501
jherman@hermanjones.com
svash@hermanjones.com

*Counsel for Plaintiff*