# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| George Kattula, Ashley Adams, John Alexander, Kenneth Axelsson, Tara Bennett, Al Bigonia, Joseph Blumetti, Darren Bradley, Dallas Bray, Franklin Calderón, Wayne Colt Carter, Allan Chiulli, Lolletta Cohen, Laleh Dallalnejad, Erick Eliezaire, Mark Gambell, Rodrigo Garcia, Mark Girshovich, Charles Glackin, Eldon Hastings, Roger Haston, Travis Houzenga, Dan Hyatt, Bobby Johnson, Jane Krieser, Eric Larson, Chris Longstreth, Ngoun Mang, Lisa Marcial, Bianca McWilliams, Victor Mechanic, Mihail Mihalitsas, Brady Lee Nessler, Frank Onimus, Vilasini Pillai, William Plyler, Edward Polhill, Steven Paperno, Luis Rodriguez, Earlando Samuel, Von Sims, Varun Singh, Larry Sowell, Vesselina Spassova, Richard Stefani, Christopher Suero, Natalie Tang, Daniel Tucker, Fatima Waheed, Eric White, Bob Whittington, and Karen Wright, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>    vs.<br><br>Coinbase Global, Inc., and Coinbase Inc.,<br><br>        Defendants. | CIVIL FILE ACTION<br>NO.  1:22-cv-03250-TWT<br><br>**CLASS ACTION**<br><br><br>JURY TRIAL DEMANDED<br><br><br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO APPOINT A RECEIVER** |

Plaintiffs, individually and on behalf of all others similarly situated ("Plaintiffs"), hereby submit this Plaintiffs' Memorandum of Law in Support of Motion to Appoint a Receiver.   For the reasons set forth below, Plaintiffs respectfully request that the Court grant this Motion and appoint a receiver for the limited purpose of examining certain accounts of Defendants Coinbase Global Inc. and Coinbase Inc. (collectively "Coinbase" or "Defendants").

## I.      INTRODUCTION

The cryptocurrency markets have proven to be highly volatile and subject to unprecedented levels of fraud and extreme instability.   Crypto exchanges have filed for bankruptcy; crypto hedge funds and brokers have collapsed; and crypto assets go missing, are stolen, or become defunct by the day.[1]   As market a participant,

---

[1] Mt. Gox filed for bankruptcy in 2014 after hundreds of thousands of Bitcoin went missing.  Celsius Networks filed for bankruptcy in April 2022, with a $1.2 billion shortfall of liabilities over assets.   In July 2022, Crypto broker Voyager Digital Ltd. and crypto hedge fund Three Arrows Capital both filed for Chapter 11 bankruptcy protection. Luna Coin and TerraUSD, both cratered and collapsed. Nine of the top ten cryptocurrencies and 72 of the top 100 coins lost more than 90 per cent of their value in this bear market. Just last week, news broke that FTX, the second largest cryptocurrency exchange, filed for bankruptcy in the midst of a "run on the bank" and with no liquid assets to honor account holders' withdrawals. Then news broke again the FTX had been hacked and lost over $470 million in crypto. U.S.-based crypto lender BlockFi is rumored to file bankruptcy soon because of "significant exposure" to FTX.   Ironically, Coinbase CEO Brian Armstrong's stated:  "I look back at all the interactions that I had with Sam [FTX's CEO]. . . . Sometimes people get in over their heads . . ." *See* CNBC Interview (Nov. 10, 2022), available at https://www.youtube.com/watch?v=ss5Rc5zYUCg.

Coinbase makes bold representations regarding the security of its platform, its purported state-of-the-art cyber-security, and its commitments to securely store customers' crypto.  Coinbase represents to the public:

- "Coinbase maintains internal systems, like a bank or a broker. Our fully audited ledger identifies your account, your fiat and crypto holdings, and tracks your account activity in real time."[2]

- "The Company has committed to securely store all crypto assets and cryptographic keys (or portions thereof) it holds on behalf of customers, and the value of these assets have been recorded as customer crypto liabilities and corresponding customer crypto assets. As such, the Company may be liable to its customers for losses arising from theft or loss of private keys."[3]

- "The Company safeguards customer crypto assets and the associated keys and is obligated to safeguard them from loss, theft, or other misuse."[4]

- Account holders can: "Simply and securely buy, sell, and manage hundreds of cryptocurrencies.[5]

- "Industry-Leading Security.  The technology that powers our platform was developed with industry-leading security and encryption at its core.  Our

---

[2] *See* https://www.coinbase.com/blog/setting-the-record-straight-your-funds-are-safe-at-coinbase-and-always-will-be.

[3] Coinbase Global, Inc., Quarterly Report (Form 10-Q) (Nov. 3, 2022) ("Coinbase 11.3.22 10-Q") at 31.  Coinbase Global, Inc. ("CGI") is a publicly-traded entity that has made numerous statements described in the Amended Complaint and herein. Coinbase, Inc., a wholly-owned subsidiary of CGI, is the provider of the online platform Coinbase.com on which customers can buy and store various crypto assets.

[4] *Id*. at 65.

[5] Declaration of John C. Herman ("Herman Decl."), filed concurrently herewith, at Ex. A.

security team is constantly working to make sure you and your assets are protected from emerging threats.[6]

In reality, however, the Coinbase platform expanded faster than Coinbase could build out adequate safety and security protocols.  As a result, and despite Defendants' assurances to the contrary, the accounts of Coinbase's customers are not secure and thousands of Coinbase accountholders have been pillaged as a result of the numerous security flaws detailed in Plaintiffs' Amended Complaint.  [ECF No. 16].  Rather than living up to its commitments to safeguard these accounts, Coinbase tells its customers as follows:

- "We will like to hear from your attorney at this point. Not you anymore! A wise person would have taken the discount offer… Sincerely, Coinbase Support."[7]

- "Hello,  Call [it] whatever you want we didn't steal your money. And stop threatening us with your attorney, be advised that our lawyers have lawyers too. We already gave you a solution [buy more crypto from us] but you don't want it. You can't be the one to dictate to us how to run our business Sincerely, Coinbase Support."[8]

- "My supervisor instructed me to hang-up on you."  At which point, Coinbase's customer service representative hung-up on a customer who could not access his account.[9]

---

[6]  *Id*. at Ex. B.
[7]  Declaration of David Lee, filed concurrently herewith, Ex. A at p.1.
[8]  *Id.*, Ex. A at p. 2.
[9]   Declaration of Robert Arndt at ¶ 8.

- Users cannot make reports to "regulatory bodies" until they complete Coinbase's months-long (sham) dispute resolution process, which process can actually continue indefinitely.[10]

- "It is your responsibility to use a strong password and maintain control of all login credentials…"[11]

- Coinbase takes months to restore users' access to accounts and even then sometimes provides on restricted account access.[12]

There are now thousands of Coinbase customers whose accounts have been hacked, looted and emptied for which Coinbase disclaims all responsibility. In fact, Coinbase has frozen many of these accounts and refuses to give the customers access to the underlying assets or the transaction data. Coinbase also holds accounts hostage when accountholders decline to agree to whatever is the newest version of its ever-evolving terms of service, a practice which undermines fair redress for aggrieved customers.

Coinbase refuses to take responsibility for its customers' accounts. Someone needs to do so. This motion seeks the immediate appointment of a receiver for the limited purpose of allowing the receiver access to Coinbase's books and records to

---

[10]   *See* Herman Decl. at Ex. C  ("[Y]ou must complete the Coinbase Complaint Resolution Process before contacting any regulatory bodies . . .").

[11]   Declaration of Karen Wright at ¶ 8 ("In response to my complaints to Coinbase and concerns about my account's security, Coinbase has blamed me for the transactions in my account that I never authorized.").

[12]   Declaration of Joseph Viers at ¶ 4; *see infra* at page 9.

(1) audit the plaintiffs' customer accounts, (2) determine if and how those accounts were compromised, (3) determine what assets, if any, remain in the accounts, and (4) determine what fees or crypto, if any, Coinbase collected and kept.  This narrowly tailored relief, which only seeks to determine the current *status quo* of the plaintiff accounts, is an exercise that Coinbase should have already done, but has not.  For the reasons set forth below, the Court should grant Plaintiffs' Motion to Appoint a Receiver.

## II.    FACTUAL BACKGROUND

To induce customers to deposit funds into Coinbase accounts, Coinbase boasts of a "heritage of security," employing "bank-level security," and being "one of the longest-running crypto platforms where customers have not lost funds due to a security breach of the platform."[13]  Coinbase promotes itself as "best-in-class," offering one of the "most secure and multifaceted risk management programs," a certified "FINRA Broker Deal" [sic], and certified by the financial institution regulatory body known as the "FFIEC."[14] Coinbase even promises "proactive security notifications" and "behind the scenes" machine learning that gives users the option to cancel a transaction "if things don't look right."[15]   As CEO Brian

---

[13] Coinbase Global, Inc., Annual Report (Form 10-K) (Feb. 24, 2022) at 8.
[14] *See* Herman Decl. at Ex. D.
[15] *See* Herman Decl. at Ex. E.

Armstrong spelled out: "Trust is critical when it comes to storing money. . . . We may not always move the fastest, or offer the lowest prices, but if we accomplish our goal of being the most trusted and easiest to use, customers will continue to choose our products and services now and in the future."[16]

Yet Coinbase has a history of being unable to secure and manage its customers' accounts.[17]  Coinbase disclosed that between March and May 20, 2021, "*at least* 6,000 Coinbase customers" had funds removed from their accounts when a third-party gained unauthorized access to Coinbase accounts by exploiting a flaw in Coinbase's two-factor authentication process.[18]  In addition to draining user accounts, the third party that breached Coinbase's security had access to users' "full

---

[16] *See* Coinbase Global, Inc., Registration Statement (Form S-1) (Feb. 25, 2021) (hereafter "Coinbase Registration Statement") at viii.

[17] Furthermore, Coinbase has a record of its employees manipulating its platform or users exploiting fundamental platform flaws.  In 2021, Coinbase settled charges by the CFTC of false, misleading or inaccurate reporting and wash trading by a former Coinbase employee. *See* https://www.cftc.gov/PressRoom/PressReleases/8369-21.  In July 2022, a former Coinbase employee was charged with wire fraud conspiracy and wire fraud in connection with insider trading using confidential Coinbase information. *See* https://www.justice.gov/usao-sdny/pr/three-charged-first-ever-cryptocurrency-insider-trading-tipping-scheme; *see also* https://www.sec.gov/news/press-release/2022-127.

[18] *See* https://oag.ca.gov/system/files/09-24-2021%20Customer%20Notification.pdf (emphasis added); *see also* Coinbase Global, Inc., 2021 Annual Report (Form 10-K) (Feb. 24, 2022) at 63. As a purported measure of security, this process delivers users a one-time security code to enter after entering their account username and password.

name, email address, home address, date of birth, IP addresses for account activity, transaction history, account holdings, and balance[,] as well as [the ability to] change the email, phone number, or other information" in the account.[19]  Coinbase failed to disclose this breach until September 2021.[20]

Coinbase continued to experience problems with its two-factor authentication process, a critical security function for securing user account holdings and personal information.  On August 28, 2021, Coinbase announced it sent "roughly 125,000 customers erroneous notifications that their [two-factor authentication] settings had changed."[21]  Coinbase claimed the "underlying issue" was fixed, but Coinbase followed-up with a *tweet* admitting, "We've got work to do to [sic] yet."[22]

---

[19] *See* https://oag.ca.gov/system/files/09-24-2021%20Customer%20Notification.pdf, at p. 2.

[20] *Id.*  Coinbase, Inc. is "currently subject to an investigation by the [New York Department of Financial Services] relating to its compliance program including compliance with the Bank Secrecy Act and sanctions laws, cybersecurity, and customer support." Coinbase 11.3.22 10-Q at 47.

[21] *See* Herman Decl. at Ex. F.

[22]   *Id.*  While its customers suffered, Coinbase profited handsomely.  Coinbase collected fees from the unauthorized transactions that Coinbase permitted in Plaintiffs' accounts.  Indeed, when a hacker gains access to an accountholder's account – Coinbase makes money.  "We generate substantially all of our total revenue from transaction fees on our platform in connection with the purchase, sale, and trading of crypto assets by our customers. Transaction revenue is based on transaction fees that are either a flat fee or a percentage of the value of each transaction."  Coinbase Registration Statement, at 17.

**A. Coinbase is incapable of managing its customer accounts**

    1. *Coinbase's lack of security exposes customer accounts, leaving users without full account access for unreasonably long periods of time.*

The CFPB recently reported that one of the thousands of recent consumer complaints against Coinbase "raises the question of whether crytpo-asset platforms are effectively identifying and stopping fraudulent transactions."[23]   Plaintiffs' experiences, along with many others, demonstrate Coinbase is indeed failing to stop fraudulent transactions and cannot secure its users accounts.  Account takeovers, unauthorized withdrawals, and account freezes have continued at a troubling pace on Coinbase since the widespread security failings in 2021 and even since the filing of this action.  To give but a few examples from the first two weeks of September *from just these Plaintiffs*:

- On or about September 1, 2022, Coinbase allowed unauthorized withdrawals from Plaintiff Karen Wright's account. Am. Compl. ¶ 520.
- On or about September 3, 2022, Coinbase allowed unauthorized withdrawals from David Garcia's account. Declaration of David Garcia at 2.
- On or about September 6, 2022, Coinbase allowed unauthorized withdrawals from Plaintiff Jane Krieser's account. Am. Compl. ¶ 322.

---

[23] Consumer Financial Protection Bureau, *Complaint Bulletin: An analysis of consumer complaints related to crypto-assets*, at p. 41 (Nov. 10, 2022), available at https://www.consumerfinance.gov/data-research/research-reports/complaint-bulletin-analysis-of-consumer-complaints-related-to-crypto-assets/

- On or about September 10, 2022, Coinbase allowed unauthorized withdrawals from Plaintiff Rodrigo Garcia's account.  Am. Compl. ¶ 259.
- On or about September 12, 2022, Coinbase allowed unauthorized withdrawals from Plaintiff Chris Longstreth's account.  Am. Compl. ¶ 341.
- On or about September 14, 2022, Coinbase allowed unauthorized withdrawals from Plaintiff Earlando Samuel's. Am Compl. ¶ 445.

Coinbase also has demonstrated it cannot provide users reliable access to their own accounts.  Plaintiff Bradley has been locked-out of his Coinbase accounts since around April 2022.  (Bradley Decl. at ¶ 10).  Although Plaintiff Larson regained access to his Coinbase account, he has since been locked-out and unable to regain access.  (Larson Decl. at ¶ 17).  Plaintiff Larson's calls to Coinbase have been futile, and his emails to Coinbase's customer service email address are no longer delivered. *Id.*  Plaintiff Al Bigonia has been locked-out or had account access interrupted since July 9, 2022.  (Bigonia Decl. at ¶ 6).  Plaintiff Mihail Mihalitsas has had his account restricted since April 2022. (Mihalitsas Decl. at ¶ 6).  Coinbase created a new account for Plaintiff Vesselina Spassova, but that account remains restricted. (Spassova Decl. ¶ 12).

Defendants' inability to manage their own users' accounts is demonstrated in this very case.  Despite having received (1) the names of the representative Plaintiffs; (2) the state in which each resides as set forth in the Amended Complaint; and (3)

9

literally hundreds of formal complaints (with internal Coinbase claim numbers), informal complaints, and customer service communications from these very same Plaintiffs, Defendants claim they are unable to identify the individuals.[24] If in fact Defendants are unable to do so, Defendants' lack of internal controls and inability to process the accounts it manages underscores the need for the relief sought herein. The number of breached or frozen Coinbase accounts is apparently so high it has overwhelmed Coinbase, which simply cannot keep pace with its security flaws.

   2.   *Coinbase is incapable of managing its accounts in response to reports of fraudulent activity.*

   Coinbase outsources critical company operations, including customer service, and abdicates responsibility for the security of those operations.[25] Coinbase admits it does "not directly manage the operation of any of these third parties, including their data center facilities that we use[,]" so the "third parties may be subject to . . . cybersecurity incidents, break-ins, computer viruses, . . . privacy breaches, . . . and other misconduct."[26] Making matters worse, Coinbase laid off 18% of its workforce in June 2022, and additional layoffs were publicized recently.[27]   As a result, Coinbase has shown it lacks the capability to secure and manage customer accounts.

---

[24] Herman Decl. at Ex. F (email from Defendants' counsel on Nov. 8, 2022).
[25] *See* Coinbase Registration Statement, at 31.
[26] Coinbase 11.3.22 10-Q at 93.
[27] *Id.* at 100.  Coinbase also takes pride in having automated its customer service.

Incredibly, even *after* users report account breaches, Coinbase fails to protect those accounts from unauthorized withdrawals. Or worse yet, Coinbase bars the true authorized user from the account, but then permits the fraudulent user access. For example, Plaintiff Vesselina Spassova notified Coinbase about issues with their account security, but Coinbase still allowed unauthorized withdrawals of funds after they notified Coinbase and after they were frozen out.[28] These problems are pervasive, including as recently as mid-October when Coinbase allowed the withdrawal of funds from another user's account after he called Coinbase to secure his account.[29] After Coinbase failed to stop unauthorized withdrawals from his account, Coinbase deleted the account and created a new one.[30]

Coinbase's communications also show an inability to identify an account's owner and verify the authority of a person to act on behalf of a Coinbase user. Coinbase has addressed multiple emails about compromised accounts to the wrong person. For example, Coinbase repeatedly emailed a "Linda" when emailing Plaintiff Eric Larson about securing his account, even after Plaintiff Larson explained to Coinbase that he is not "Linda."[31] Similarly, in April 2022, Plaintiff

---

[28] *See* Am Compl. ¶¶ 464-470; Declaration of Vesselina Spassova.
[29] *See* Declaration of Alain Wicke.
[30] *Id.*
[31] Declaration of Eric Larson, at ¶¶ 8-12

11

Darren Bradley received a password reset email from Coinbase that was addressed to "Alexander Ross," which of course is not his name or a name on his account.[32] When Plaintiff Bradley contacted Coinbase and requested access to his account, some emails from Coinbase Support to Plaintiff Bradley were addressed "Hello Alexander," even after Plaintiff Bradley called Coinbase to report the issue.[33]

### B. Coinbase opens fraudulent accounts.

According to Coinbase's customer service (and reminiscent of the Wells Fargo account fiasco), Coinbase creates Coinbase Pro accounts for users without their permission or knowledge. Coinbase leaves those accounts unsecured, providing a backdoor for third parties to steal from Coinbase users. Coinbase users don't even know they have these accounts, much less that they need to be secure.[34]

Plaintiff Larson never authorized the opening of a Coinbase Pro account. Nevertheless, after his Coinbase account was compromised, Coinbase informed him that "[a]ll Coinbase users have Coinbase Pro accounts…"[35] Coinbase claimed Plaintiff Larson's funds were transferred from his Coinbase account to his Coinbase Pro account, from which Coinbase claims they were sent to an external location in

---

[32] Declaration of Darren Bradley at ¶ 5.
[33] *Id.* at ¶¶ 6, 7.
[34] Larson Decl. at ¶¶ 4,6.
[35] *Id.* at ¶ 6.

multiple transfers.  Plaintiffs Ashley Adams and Charles Glackin also had their Coinbase accounts emptied, and according to Coinbase the funds were transferred to a Coinbase Pro account.  *See* Declaration of Ashley Adams at ¶ 10; Declaration of Charles Glackin at ¶ 4.  Neither Ashley Adams nor Charles Glackin opened or gave anyone authorization to open a Coinbase Pro account.  Adams Decl. at ¶ 6; Glackin Decl. at ¶ 4.  Similarly, Plaintiff Karen Wright received a Coinbase Card, a debit card, that she did not request.  When Ms. Wright informed Coinbase she did not request the Card, Coinbase refused to cancel it.  Declaration of Karen Wright at ¶ 6.

## C. After accounts are deleted, frozen, or looted, Coinbase cannot accurately record account activity.

Coinbase cannot account for missing cryptocurrency and refuses to provide users with complete information about what happened in their accounts, including what personal information may have been compromised, where their funds went, and/or what profits Coinbase unjustly collected from any unauthorized transactions.

On September 19, 2022, Coinbase inexplicably closed Plaintiff Franklin Calderón's Coinbase Pro account, and Coinbase informed him his account holdings would be available for withdrawal from a (regular) Coinbase exchange account (Declaration of Franklin Calderón at ¶ 9).  However, only a tiny percentage of his account holdings were transferred to the accessible account.  Coinbase has provided

automated or stalling messages in response to Plaintiff Calderón's inquiries regarding his missing cryptocurrency. After Plaintiff Calderón submitted a "Formal Complaint" to Coinbase, he got another invitation to submit a complaint. (*Id.* at ¶ 10).

Plaintiff Calderón is far from alone. Coinbase refuses to or cannot account for other account holdings. For example, several Coinbase users are missing staked Ethereum ("ETH2"). *See* Declaration of David Garcia at ¶ 8; Declaration of Kelechukwu Osuji at ¶¶ 14-15. ETH2 is a cryptocurrency that cannot be moved from Coinbase's platform, but it may become movable at a later date.

For other users, Coinbase refuses to provide information about where their account holdings are or where they went. *See, e.g.*, Declarations of Daniel Hyatt and Lisa Marcial. What limited information Coinbase does provide is contradictory or incorrect. *See, e.g.*, Declarations of Daniel Tucker, Travis Houzenga, and Vesselina Spassova. The unauthorized transactions that apparently drained Plaintiff Chiulli's account fail to even appear in his account's transaction history. (Chiulli Decl. at ¶ 9).

### D. Coinbase forces users, including members of class actions against Coinbase, to agree to new arbitration agreements before being able to access their accounts.

Coinbase, Inc. has unilaterally amended its purported User Agreement no fewer than 30 times over the past 3 years, including at least four times since this case was filed in August 2022.[36] Thereafter, Coinbase holds accounts hostage when accountholders decline to agree to whatever is the newest ever-evolving terms of service, which seeks to undermine fair redress for aggrieved customers. As a result, users are not able to access their account holdings and are unable to access their accounts to download data necessary for income tax reporting – unless the users forfeit rights and agree to the coerced "updated" terms of service.[37]

All of the above makes clear that a receiver needs to be appointed to render an accounting and protect the Plaintiffs' assets.

## III.   LEGAL STANDARD FOR APPOINTMENT OF A RECEIVER

Under Rule 66 of the Federal Rules of Civil Procedure, the appointment of a receiver by a court is an appropriate remedial step when a plaintiff demonstrates an important right of interest in property that is threatened and in need of protection and the appointment is "auxiliary to some primary relief which is sought and which equity may appropriately grant." *Kelleam v. Maryland Cas. Co. of Baltimore, Md.*, 312 U.S. 377, 381, 61 S.Ct. 595, 85 L.Ed. 899 (1941). "[F]ederal law governs the

---

[36] *See Underwood v. Coinbase Global Inc.*, Case No. 1:21-cv-08353-PAE, ECF No. 35-1 & ECF No. 36-1 at fn. 1 (S.D.N.Y. Feb. 3, 2022) (listing past amendments).
[37] *See* Declaration of Bobby Johnson at ¶¶ 7-8.

appointment of a receiver by a federal court exercising diversity jurisdiction." *Nat'l P'ship Inv. Corp. v. Nat'l Hous. Dev. Corp*., 153 F.3d 1289, 1292 (11th Cir. 1998). It is well-established that "[t]he decision to appoint a receiver is an equitable one which rests 'in the sound discretion of the court.'" *U.S. Bank Nat'l Ass'n v. LG-328 Huntsville*, AL, LLC, No. 5:17-CV-01378-AKK, 2017 WL 5668392, at *1 (N.D. Ala. Nov. 27, 2017) (quotation omitted); *Gill v. Hartshorn*, No. 4:12-CV-77 (CDL), 2014 WL 12711871, at *1 (M.D. Ga. Jan. 9, 2014) ("The Court in its discretion may appoint a receiver in appropriate circumstances.") (citing *Nat'l P'ship Inv. Corp. v. Nat'l Hous. Dev. Corp*., 153 F.3d 1289, 1292 (11th Cir. 1998)).

The Eleventh Circuit recognizes that "[a] receiver is a neutral court officer appointed by the court, usually to 'take control, custody, or management of property that is involved in or is likely to become involved in litigation for the purpose of ... undertaking any [ ] appropriate action.'" *Sterling v. Stewart*, 158 F.3d 1199, 1201 n.2 (11th Cir. 1998) (quotation omitted).  While there is no precise formula for determining when a court should appoint a receiver, "several factors should be considered: (1) whether fraudulent activity has or will occur, (2) the validity of the claim, (3) the danger that property will be lost or diminished in value, (4) inadequacy of legal remedy, (5) availability of less severe equitable remedy, and (6) the probability that a receiver may do more harm than good." *Clough Mktg. Servs., Inc.*

16

*v. Main Line Corp.*, No. 1:07-CV-0173R, 2007 WL 496739, at *2 (N.D. Ga. Feb. 13, 2007).  A court can, in its discretion, appoint a receiver for a limited purpose or scope of powers.  *See, e.g., Voyles v. Rice*, No. 1:12-CV-3146-SCJ, 2013 WL 12106335, at *6 (N.D. Ga. Sept. 6, 2013) (stating court's intention to appoint a receiver for limited purpose of representing interests of a corporate party); *United States v. Kight*, No. 1:16-CR-99-WSD, 2017 WL 4619024, at *5-6 (N.D. Ga. Oct. 16, 2017) (noting court in a related case appointed a receiver for limited purposes, including forensic auditing, and investigating and reporting on assets of trusts).

As here, "there probably has been fraudulent conduct, and there is imminent danger of the property being concealed, lost or diminished in value, legal remedies are not adequate, and the harm to the movant by denial would be greater than that to the opposing parties on appointment, [and] the appointment should be granted." *Bookout v. Atlas Fin. Corp.*, 395 F. Supp. 1338, 1341 (N.D. Ga. 1974), *aff'd sub nom. Bookout v. First Nat. Mortg. & Disc. Co.*, 514 F.2d 757 (5th Cir. 1975).

## IV.   DISCUSSION

### A. This Court Has the Authority to Appoint a Receiver Now.

The relevant factors the Court should consider in appointing a receiver weigh heavily in favor of granting the relief Plaintiffs seek.  Moreover, since Bitcoin and other crypto assets are sufficiently identifiable so as to be considered

17

"specific intangible property," *BDI Cap., LLC v. Bulbul Invs.* LLC, 446 F. Supp. 3d 1127, 1137 (N.D. Ga. 2020), the equitable remedy of an accounting is appropriate as a remedy auxiliary to the primary relief sought in Plaintiffs' Amended Complaint. *Kelleam*, 312 U.S. at 381.

    1. *Fraudulent Activity Has and Will Continue to Occur*

In addition to the fraud resulting from security flaws at Coinbase detailed in the Amended Complaint, Coinbase has also directly committed fraudulent and deceptive acts, including: (1) fraudulently opening unauthorized accounts for each accountholder without their knowledge and without their permission; (2) inducing Plaintiffs to place their fiat currency and crypto assets in Coinbase's care with representations and guarantees as to their security, while Coinbase had no infrastructure to secure the currency and assets and no intent to secure the assets; (3) failing to tell Plaintiffs that Coinbase makes money on every transaction – authorized or unauthorized; (4) failing to account for or return transaction fees to Plaintiffs for demonstrated unauthorized transfers; (5) exercising self-help by illegally seizing Plaintiffs' cryptocurrency as fees or chargebacks for unauthorized activity; (6) threatening accountholders by falsely claiming that accountholders cannot make reports to regulatory bodies and suggesting that doing so will cause them to violate the terms of the sham dispute-resolution process and forfeit resolution; and (7)

holding Plaintiffs' accounts hostage, coercing them to agree to new, less favorable terms of service that undermine their legal rights.   These facts, as well as many others set forth in the Amended Complaint, demonstrate that there is rampant fraudulent conduct underlying this case and the relief requested is plainly warranted. But that's not all.   Coinbase knows well – as set forth in its SEC filings and in Plaintiffs' complaints to Coinbase – that Plaintiffs' accounts are at risk of being hacked, their accounts and wallets are being breached, and their assets are being drained and pilfered.   This factor weighs heavily in favor of the limited relief requested. *See SEC v. Wencke*, 783 F.2d 829, 837 n.9 (9th Cir. 1986) (court may impose receiverships in securities fraud actions to protect defrauded investors from further loss of assets).

2. *Plaintiffs' Claims to Their Own Property Cannot Be Disputed*

The second factor, validity of the claim, speaks to Plaintiffs' right to the property in question.   There is no dispute – indeed there cannot be – that Plaintiffs own and are entitled to the fiat currency and crypto assets in their own accounts. Coinbase makes no claim otherwise, nor can it.   The validity of Plaintiffs' claim to their own assets weighs in favor of the requested receiver and accounting.

3. *There is Significant Risk that Plaintiffs' Property Will be Lost, Stolen or Diminished in Value Persists*

The third factor, risk of loss, clearly weighs in favor of the requested receiver.

*First*, as set forth in detail above and in the Amended Complaint, Plaintiffs' accounts in fact have been hacked and their fiat currency and crypto assets have in fact been stolen, dissipated and pilfered. These fraudulent activities are occurring in real time unabated. To the extent Plaintiffs have any hope of unwinding these fraudulent transactions, time is of the essence. Yet Coinbase bars access to Plaintiffs' accounts in many instances.

*Second*, Plaintiffs' loss of access to their own fiat currency and crypto assets in Coinbase accounts means that for an extended period of time Plaintiffs are losing unquantifiable investment opportunities. Coinbase's freezing of accounts likewise risks diminishing Plaintiffs' property, as it has and will continue to deprive Plaintiffs of their own assets, investment opportunities attendant to owning those assets, and the ability to trade in or move out of the market during a time of intense volatility – when Plaintiffs stand to gain or lose the most. Moreover, as each day goes by, Plaintiffs whose accounts are frozen are at risk of their assets being further stolen or dissipated on Coinbase's unsecure platform.

*Third*, the number of operations and services that Coinbase contracts out means that Plaintiffs' accounts may never be properly secured, and there is no way to tell how many third parties have access to Plaintiffs' accounts, wallets, and personally identifiable information. This harm, which is not quantifiable, will

continue because Coinbase contracts so many facets of its operations out to third parties, rendering Plaintiffs at unique risk of having their assets stolen and their accounts depleted.

*Finally*, there is no Plan B to protect these customers.  Cryptocurrency exchanges are different from traditional brokerage firms, and as of yet are not members of the Securities Investor Protection Corp., or SIPC, a federally-created nonprofit charged with overseeing the liquidation of brokerage firms.  And despite Coinbase's assurances regarding FDIC with respect to fiat currency, cryptocurrency is not subject to Federal Deposit Insurance Corporation or SIPC protections.  Thus, in the event of a bankruptcy of either the underlying asset class or Coinbase itself, it does not appear that any law (such as the Securities Investor Protection Act, or SIPA) provides a recovery priority for customer assets or otherwise accounts for how to return them if Coinbase – like FTX – is liquidated in bankruptcy.[38]

4.  *Plaintiffs' Assets Are in Danger of Being Lost Forever and No Remedy at Law Will Suffice to Protect Them*

---

[38] Coinbase 11.3.22 10-Q at 96 ("[B]ecause custodially held crypto assets may be considered to be the property of a bankruptcy estate, in the event of a bankruptcy, the crypto assets we hold in custody on behalf of our customers could be subject to bankruptcy proceedings and such customers could be treated as our general unsecured creditors.")

A legal remedy for monetary relief alone will not adequately protect Plaintiffs' equitable ownership interest in the crypto assets at issue. *Astrove v. Doe*, No. 22-CV-80614-RAR, 2022 WL 2805345, at *5 (S.D. Fla. June 17, 2022). In fact, equitable relief is the typical remedy to keep Plaintiffs' assets safe and to keep Coinbase from further dissipating Plaintiffs assets so they can be preserved and ultimately released to Plaintiffs. *Id.*

Absent immediate appointment of a receiver and an immediate accounting, no remedy at law will suffice. As courts in this circuit have found: "considering the speed with which cryptocurrency transactions are made, the fact that transactions on the . . . blockchain are irreversible, as well as the pseudonymous nature of those transactions, remedies at law are inadequate to redress the harm" to a plaintiff. *Leidel v. Project Invs., Inc.*, No. 9:16-CV-80060, 2021 WL 4991325, at *2 (S.D. Fla. May 28, 2021). Dissipating assets illegally obtained or kept from Plaintiffs renders a judgment on the merits meaningless and any possible recovery from Coinbase unlikely. In its own statements, Coinbase makes clear that once a crypto asset is exchanged, traded or otherwise dissipated, it cannot be reversed or undone.[39]

5. *No Less Severe Equitable Remedies Will Protect Plaintiffs' Property*

---

[39] Declaration of Daniel Tucker at ¶ 4.

A district court "has broad powers and wide discretion to determine relief in an equity receivership." *S.E.C. v. Wells Fargo Bank, N.A.*, 848 F.3d 1339, 1343-44 (11th Cir. 2017) (quoting *S.E.C. v. Elliot*, 953 F.2d 1560, 1566 (11th Cir. 1992). Here, Plaintiffs' request for a receiver is narrowly-tailored and purposefully limited, addressing only immediate, emergent concerns of the Plaintiffs who are at risk. Though within this Court's equitable powers, Plaintiffs have not here asked for the receiver to assume custody over any account or for Coinbase or its exchange to themselves be placed into a receivership at this time.   While this Court has wide discretion to fashion equitable relief from its inherent powers in equity, the narrow scope of relief requested is the least severe remedy available to Plaintiffs. *Id.* (citing *SEC v. Safety Finance Service, Inc.*, 674 F.2d 368, 372 (5th Cir. 1982)).

### 6. *The Receiver Will Do Significant Good and Poses No Harm*

Appointing a receiver in this matter will do significant good and poses no harm.   The injury to Plaintiffs as a result of Coinbase's failure to secure their accounts and personally identifiable information drastically outweighs the negligible harm (if any) that the narrowly-tailored equitable relief sought herein may cause Coinbase.   Where, as here, Defendants have "no right to claim either possession or ownership of the [cryptoassets]" the actual and threatened injuries to Plaintiffs outweigh any possible harm to Defendants and the balance of hardships weighs

23

decidedly in favor of granting equitable relief. *Leidel v. Project Invs., Inc.*, No. 9:16-CV-80060, 2021 WL 4991325, at *2 (S.D. Fla. May 28, 2021).

Here the balance of equities supports appointing a receiver and requiring Coinbase to cooperate in a narrowly-tailored accounting of Plaintiffs' accounts. As discussed in the numerous declarations submitted herewith, Plaintiffs have spent years building up their assets and life savings and have entrusted it to Coinbase, trusting Coinbase's over-the-top representations of best-in-class cyber security and safekeeping. As outlined above, Coinbase's severe failings have left Plaintiffs with no way to secure their assets or even to know what remains in their accounts.

Conversely, Coinbase should have already performed the very relief requested before Plaintiffs needed to seek legal assistance to protect their rights. Thus, if the Court orders the requested receiver and accounting, Plaintiffs will be more protected and Coinbase will function unaffected. *See generally Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of [interim relief] is merely to preserve the relative positions of the parties until a trial on the merits can be held.")

### B. Appointing a Receiver Is In the Public Interest

Appointing a receiver to conduct an accounting also serves the public interest. First, the narrowly-tailored relief requested serves the public interest by "preserving the integrity of Money Services Businesses (of which several of the cryptocurrency

exchanges [including Coinbase] noted above are qualified), preserving and stabilizing the worldwide use of cryptocurrencies, and promoting the objectives of the Financial Crimes Enforcement Network ("FinCEN")… by providing assurance that courts will protect investors' assets from theft and will aid investors in their recovery of stolen assets." *Astrove v. Doe*, No. 22-CV-80614-RAR, 2022 WL 2805345, at *5 (S.D. Fla. June 17, 2022).

Moreover, the appointed receiver will protect the interests of accountholders who have trusted their assets and life savings to Coinbase, whose assets are at risk and who have been afforded no relief from Defendants.  Further, a receiver can assure that Defendants stop profiting from transactions not made by, on behalf of, or in the interest of the Plaintiff accountholders and will require that Defendants take the necessary action to help secure Plaintiffs' accounts.  Importantly, it is Plaintiffs' very own assets they seek access to and an accounting of, and it is Defendants who are disclaiming liability, avoiding responsibility and renouncing the duty to secure them.  It is in the public interest for the Court to step in, appoint a receiver and empower an immediate accounting.

## V.    CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Appointment of a Receiver should be GRANTED.

Respectfully submitted, this 16th of November, 2022.


HERMAN JONES LLP

/s/ *John C. Herman*

John C. Herman
  (Georgia Bar No. 348370)
Serina M. Vash (admitted pro hac vice)
HERMAN JONES LLP
3424 Peachtree Road, N.E., Suite 1650
Atlanta, Georgia 30326
Telephone:  (404) 504-6500
Facsimile:  (404) 504-6501
jherman@hermanjones.com
svash@hermanjones.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE WITH LR 5.1

I hereby certify that the foregoing document is written in 14-point Times New Roman font in accordance with Local Rule 5.1.

By: /s/ *John C. Herman*

John C. Herman
 (Ga. Bar No. 348370)
HERMAN JONES LLP

*Attorney for Plaintiffs*

27

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this day electronically filed the foregoing document with the Clerk of the District Court, and the CM/ECF system will send notification of such filing to all attorneys of record.

Dated: November 16, 2022

/s/ John C. Herman
John C. Herman
*Counsel for Plaintiffs*